ORIGINAL

EDWARD H. KUBO, JR.    #2499
United States Attorney
District of Hawaii

RONALD G. JOHNSON    #4532
Chief, Major Crimes

RACHEL S. MORIYAMA    #3802
Assistant U.S. Attorney
Room 6-100, PJKK Federal Building
300 Ala Moana Boulevard
Honolulu, Hawaii  96850
Telephone: (808) 541-2850
Facsimile: (808) 541-2958
E-mail:    Rachel.Moriyama@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

AUG 29 2008

at ___ o'clock and ___ min. ___ M.
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>     vs.<br><br>RICHARD HARRIS,<br><br>          Defendant. | CIV. NO. 08-00291 DAE/KSC<br>CR. NO. 03-00141 DAE<br><br>UNITED STATES' MEMORANDUM<br>IN OPPOSITION TO DEFENDANT<br>RICHARD HARRIS' MOTION<br>TO VACATE, SET ASIDE OR<br>CORRECT SENTENCE BY A PERSON<br>IN FEDERAL CUSTODY UNDER<br>28 U.S.C. § 2255; EXHIBITS<br>1-3; CERTIFICATE OF SERVICE |

<u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . i-ii

I.    STATEMENT OF FACTS . . . . . . . . . . . . . . . . . 2

      A.    Procedural History. . . . . . . . . . . . . . 2

      B.    Factual Summary . . . . . . . . . . . . . . . 3

            1.    The Bank Robber . . . . . . . . . . . . 3

            2.    The Identification Of Defendant As The
                  Robber . . . . . . . . . . . . . . . . 5

            3.    The Operations Of The Laumaka Work
                  Furlough Center, And Defendant's
                  Ability To Commit The Bank Robbery . . . . . . . 9

            4.    Defendant's Change In Appearance After
                  The Bank Robbery . . . . . . . . . . . . 12

II.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . 13

      A.    Harris' Motion Does Not Warrant An Evidentiary
            Hearing Because He Failed To Assert Specific
            Factual Allegation and Presents Only Frivolous
            Legal Arguments . . . . . . . . . . . . . . . 13

      B.    Harris' Failure To Present His Claims To The
            District Court And On Direct Appeal Constitutes
            A Waiver That Bars Review Under § 2255. . . . . . 14

      C.    Harris' Motion Must Be Denied On The Merits . . . . 16

            1.    This Court Had Proper Jurisdiction Over
                  Harris' Prosecution. . . . . . . . . . . 16

            2.    Harris' Due Process Claims Are Frivolous . . . 18

            3.    Harris' Ineffective Assistance of Counsel
                  Argument Is Without Merit. . . . . . . . 19

            4.    Harris' Claim Of Fraud Must Be Rejected As
                  Totally Frivolous. . . . . . . . . . . . 21

III.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . 21

TABLE OF AUTHORITIES

CASES                                                              PAGE(S)

De La Maza v. United States, 215 F.2d 138
        (9th Cir. 1954) . . . . . . . . . . . . . . . . . 18

Shah v. United States, 878 F.2d 1156
        (9th Cir. 1989) . . . . . . . . . . . . . . . . . 14

Shraiar v. United States, 736 F.2d 817
        (1st Cir. 1984) . . . . . . . . . . . . . . . . . 13

Strickland v. Washington, 466 U.S. 668 (1984) . . . . . . 19, 20

United States v. Delgado-Garcia, 374 F.3d 1337
        (D.C. Cir. 2004) . . . . . . . . . . . . . . . . 17

United States v. Donn, 661 F.2d 820, 824
        (9th Cir. 1981) . . . . . . . . . . . . . . . . . 15

United States v. Grewal, 825 F.2d 220
        (9th Cir. 1987) . . . . . . . . . . . . . . . . . 15

United States v. Johnson, 988 F.2d 941
        (9th Cir. 1993) . . . . . . . . . . . . . . . . . 15

United States v. Lampley, 127 F.3d 1231
        (10th Cir. 1997) . . . . . . . . . . . . . . . . 18

United States v. Morton, 467 U.S. 822 (1984) . . . . . . . 16

United States v. Przybyla, 737 F.2d 828
        (9th Cir. 1984) . . . . . . . . . . . . . . . . . 18

United States v. Quan, 789 F.2d 711
        (9th Cir. 1986) . . . . . . . . . . . . . . . . . 13, 14

United States v. Ratigan, 351 F.3d 957
        (9th Cir. 2003) . . . . . . . . . . . . . . . . . 17

United States v. Redd, 759 F.2d 699
        (9th Cir. 1985) . . . . . . . . . . . . . . . . . 15

United States v. Schaflander, 743 F.2d 714, 717
        (9th Cir. 1985) . . . . . . . . . . . . . . . . . 13, 14

i

STATUTES AND RULES                                           PAGE(S)

18 U.S.C. § 2113(a) . . . . . . . . . . . . . . . 2, 16, 17

18 U.S.C. § 3231  . . . . . . . . . . . . . . . . 16, 17

18 U.S.C. § 3232  . . . . . . . . . . . . . . . . . . 18

28 U.S.C. § 2255  . . . . . . . . . . . . . . . . passim

Fed. R. Crim. P. 12(b)(3) . . . . . . . . . . . . . 15

Fed R. Crim. P. 18  . . . . . . . . . . . . . . . . 18


OTHER

U.S. Const. Art. III, § 2 . . . . . . . . . . . . . 17

Hawaii Statehood Admissions Act, Pub. L. No. 86-3,
     73 Stat 4 (1959) . . . . . . . . . . . . . . . 17

UNITED STATES' MEMORANDUM IN OPPOSITION TO
DEFENDANT RICHARD HARRIS' MOTION TO
VACATE, SET ASIDE OR CORRECT SENTENCE BY A
PERSON IN FEDERAL CUSTODY UNDER 28 U.S.C. § 2255

The United States of America, through its undersigned attorneys, hereby submits this memorandum in opposition to Defendant Richard Harris' Motion to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody Under 28 U.S.C. § 2255.

In his pro se § 2255 Motion (including a rambling and incomprehensible attachment and memorandum), Harris appears to raise four claims:

    (1)   Ground 1: Without any specific factual support, Harris appears to contest the district court's authority and subject matter jurisdiction to adjudicate his criminal case;

    (2)   Ground 2: Notwithstanding that he was indicted by a federal grand jury, he argues that the absence of a criminal complaint and supporting affidavit violated his due process rights and voids his conviction;

    (3)   Ground 3: He alleges that his trial counsel was ineffective for failing to challenge the Court's subject jurisdiction and for failing to challenge the identification of Harris as the bank robber by pointing out the lack of fingerprint evidence; and

    (4)   Ground 4: Without any specific factual support, he appears to argue that the prosecutor committed fraud by failing to match fingerprints that had been lifted from the counter in the bank.

For the reasons set out below, this Court (1) should find that Harris' § 2255 Motion does not warrant an evidentiary hearing; and (2) deny the § 2255 Motion on procedural and substantive grounds.

1

I.  STATEMENT OF FACTS

   A.  <u>Procedural History</u>.

     On March 28, 2003, a grand jury sitting in the District of Hawaii, returned a one-count Indictment charging Richard Harris with committing bank robbery by force, violence and intimidation, in violation of 18 U.S.C. § 2113(a).  <u>See</u> Indictment filed in <u>United States v. Richard Harris</u>, Cr. No. 03-00141 DAE, a copy of which is attached hereto as Exhibit 1.

     Following a three-day jury trial, Harris was convicted of the bank robbery on October 6, 2003.  On February 6, 2006, Harris was sentenced to 125 months of imprisonment, three years of supervised release, restitution in the amount of $1,200 to City Bank, and a special monetary assessment of $100.

     Harris appealed his conviction and sentence.  <u>See</u> <u>United States v. Richard Harris</u>, C.A. No. 06-10151 (9th Circuit). On June 18, 2007, the Ninth Circuit Court of Appeals affirmed the conviction and sentence in an unpublished memorandum opinion and entered its judgment.  <u>See</u> Exhibits 2 and 3.

     On June 16, 2008, Harris timely filed the instant motion pursuant to 28 U.S.C. § 2255 to vacate, set aside or correct sentence and memorandum of law in support of his motion. Harris' motion consists of three pleadings: a pre-printed motion form filed herein as Document No. 1 (hereinafter the "Motion"); a 24-page attachment filed herein as Document No. 1-2 (hereinafter

the "Attachment"); and an 11-page memorandum filed herein as

Document 1-3 (hereinafter the "Memorandum").

    B.    <u>Factual Summary</u>.

        1.   <u>The Bank Robbery</u>

        On December 18, 2002, at approximately 11:45 a.m., an

African American male, approximately 6'0" tall and weighing 180-

200 pounds, walked into the Kalihi Branch of City Bank, located

at 2119 King Street, Honolulu, Hawaii. <u>See</u> Transcript of

Proceedings in Cr. No. 03-00141 DAE ("TR"), 10/1/03 at 36, 80,

111 and Government's Exhibit 8. The man was wearing sunglasses,

and a blue bandana with white designs. TR, 10/1/03 at 36-38, 55-

56. The man had curly, black hair sticking out of the bandana.

<u>Id.</u> at 56. After entering the bank, the man went to a courtesy

counter where the bank kept its transaction slips. <u>Id.</u> at 96.

The man waited in line for less than a minute for an open teller

station. <u>Id.</u> at 49.

        The man walked up to teller Carmela Nakihei's window

after she completed a transaction. <u>Id.</u> at 37-38. He put his

right hand in a small bag, and put in on the counter. <u>Id.</u> at 39.

The bag looked like a camera bag. <u>Id.</u> at 40. The man leaned in

toward Nakihei, and slipped a note across the counter with his

left hand. <u>Id.</u> at 41. A note was written on the back of a bank

slip. <u>Id.</u> at 47. The note had three lines, and began with the

words, "I have a gun." <u>Id.</u> at 41. Nakihei read the first line

3

and froze.  Id. at 42.  The man leaned in and told Nakihei to give him all her money, and not to say anything.  Id. at 42.

Nakihei opened her drawer, cleaned out the register, and gave the man all of her money.  Id. at 42-43.  The man put the money in his bag and ran out of the bank.  Id. at 43.  The man escaped with $1,201 in funds belonging to City Bank, TR. 10/2/03 at 95, a financial institution whose deposits were insured by the Federal Deposit Insurance Corporation.  TR, 10/1/03 at 122.

The transaction at Nakihei's window took less than a couple of minutes.  TR, 10/1/03 at 53-54.  When the man left, Nakihei ducked down behind the counter, and pressed an alarm which notified Alert Alarm.  Id. at 43, 78-79.

Elizabeth Lallier, the City Bank Kalihi branch manager, saw some of the foregoing events.  Id. at 92.  Lallier was about an arm's length away, at a station adjacent to Nakihei's teller window.  Id. at 94.  Lallier saw the robber enter the bank and go to the courtesy counter.  Id. at 96.  She also noticed the man at Nakihei's teller station, after which she saw Nakihei drop to the floor crying.  Id. at 97-98.  Lallier knew the bank had been robbed.  Id. at 98.  She looked up and saw the man leave the bank through doors which fronted King Street.  Id. at 101.  Lallier had a view of the man's profile, and saw that his hair was sticking out of a bandana.  Lallier believed the man had clumps

4

of hair in a dreadlocks style.  Id. at 99-100.

Honolulu Police Department (HPD) officers responded to the bank and obtained a description of the robber.  TR, 10/2/03 at 63.  Nakihei and Lallier described the man.  Id. at 65. Nakihei said the man had dark, wavy hair, and Lallier said it was long.  Both said the man's hair was in clumps, and that he was wearing a bandana.  Id. at 65-66.

> 2.    The Identification Of Defendant As
>        The Robber.

The investigation was assigned to Detective Taro Nakamura, a member of HPD's robbery detail.  Id. at 36-37, 63. Detective Nakamura had been with HPD for eleven years, and had investigated hundreds of burglaries or property crimes, and 15-20 bank robberies.  Id. at 37, 96.  Some fingerprints were recovered from the bank, but there were no matches.  Id. at 93.  Detective Nakamura asked "Crime Stoppers" to broadcast information about the City Bank robbery.  Id. at 66-67.  The broadcast included some bank surveillance photographs, and a description of the robber.  Id.

On December 20, 2002, Detective Nakamura asked Nakihei to meet with a composite sketch artist.  Id. at 68.  Nakihei described the robber's face.  The most prominent feature she remembered were his eyes, which were "huge, round ... [and] ... glossy."  TR, 10/1/03 at 54-55.  Nakihei could see his eyes around the sunglasses.  Id.  After working with Nakihei, the

artist put together a composite sketch, which was given to Crime
Stoppers and published.  Government Exhibit 49; TR, 10/2/03 at
69.

On January 6, 2003, Doveline Borges of the Laumaka Work
Furlough Center called Detective Nakamura.  Id. at 69.  Laumaka
was a residential program run by the State of Hawaii to assist
individuals making a transition to independent living.  Borges
told Detective Nakamura that Richard Harris, a resident of
Laumaka, resembled the person who was depicted on Crime Stoppers.
Id. at 69.  Borges gave Detective Nakamura a photograph of
Harris.  Id. at 69-70.

After identifying Harris as a potential suspect of the
robbery, Detective Nakamura assembled two photo spread lineups.
TR, 10/2/03 at 38; Government Exhibits 51, 53.  Detective
Nakamura selected photographs of six people with similar physical
characteristics.  Because witnesses described the robber as
having dreadlocks, braids or corn rows, Detective Nakamura tried
to obtain pictures of persons with the same type of hair.  TR,
10/2/03 at 39-40.  Detective Nakamura used one photograph of the
defendant with dreadlocks or braids, and one without.  TR,
10/1/03 at 41.  The photograph of defendant with dreadlocks was
inserted as photograph number three on the photo spread which was
Government's Exhibit 51.  Id. at 41-42, 47.  This photograph was
taken in 2001.  Id. at 47.

6

On January 10, 2003, Detective Nakamura showed the
photo spread to Nakihei.  Before displaying the photographs,
Detective Nakamura read her a set of instructions.  Id. at 43.
The form recited that the person who committed the crime might
not be depicted in the group of photographs, that the witness was
not obligated to identify anyone, and that it was just as
important to eliminate innocent persons as to identify guilty
persons.  Government Exhibit 50.  The form further recited, and
Detective Nakamura indicated, that Nakihei should review each
photograph carefully, that the photographs could be old or new,
and that hairstyles could change or be the same.  Id.; TR,
10/2/03 at 43.   After being instructed about these procedures,
Nakihei signed the form.  Government Exhibit 50; TR, 10/1/03 at
61-62.

Upon viewing the photo spread, Nakihei "immediately
reacted" to photograph number three, gasping and making an
expression.  TR, 10/2/03 at 44-45.  Nakihei nonetheless went
through the process of looking through all the photographs before
identifying the person in photograph number three as the robber.
Id.  Nakihei then wrote that the person in photograph number
three "is the man who robbed me on December 18, 2002."
Government Exhibit 50.  She further noted, "The robber had a
bandana on but by looking at his face I know he's the one."  Id.
At trial, Detective Nakamura made an in-court identification of

the defendant as the person who was depicted in photograph number three.[1]  Id. at 47, 61-62.  The photograph was taken in 2001, and Detective Nakamura identified it as being a photograph of the defendant based on personal identifiers and fingerprint comparisons.  Id. at 61-62.

After Nakihei made the photo spread identification, Detective Nakamura showed her a second photograph of defendant. This photograph was in color, rather than black and white.  It also showed defendant with short hair.  TR, 10/2/03 at 49. Nakihei said it was a "much better" picture, because it showed defendant's eyes.  TR, 10/1/03 at 66-68.

Detective Nakamura thereafter prepared a second photo spread, which showed the faces and side profiles of six individuals including the defendant.  TR, 10/2/03 at 49-50, 60-61; Government Exhibit 52.  Based on Nakihei's comments, he used the color photograph of the defendant, even though defendant's hair was shorter in the photograph.  TR, 10/2/03 at 49. Detective Nakamura also wanted to have side profiles because Lallier, the City Bank branch manager, had seen more of a profile of the robber.  Id. at 49, 61.

On January 13, 2003, Detective Nakamura showed the second photo spread to Lallier.  Before having her inspect the

---

[1]  Detective Nakamura had obtained this photograph from Doveline Borges of the Laumaka Work Furlough Center.  TR, 10/2/03 at 69-70.

8

photographs, Detective Nakamura gave Lallier the same instructions which had been given to Nakihei. Id. at 48-49, 60-61; Government Exhibit 52. Lallier inspected the photo spread which showed the face and side profiles of the six individuals. TR, 10/1/03 at 104-5. She selected the person depicted in photograph three, and said it "look[ed] like the man" who robbed the bank, although his hair had been "a little longer" at the time. Id. at 104-6; Government Exhibit 52. Detective Nakamura testified that the person shown in that photograph was the defendant. TR, 10/2/03 at 48-50, 61-2.

       3.   The Operations Of The Laumaka Work
            Furlough Center, And Defendant's
            Ability To Commit The Bank Robbery.

     Laumaka was a residential center which housed inmates making a transition back into the community. TR, 10/1/03 at 125. Laumaka had approximately 90 residents who lived in three dormitories. The facility was surrounded by a fence and by surveillance cameras at the perimeter of the buildings. Id. at 131-33. Laumaka issued passes allowing residents to leave the facility to go to work or to seek jobs. Laumaka had regular head counts at about 9:00 a.m. and between 1:00 and 1:30 p.m. each day. TR, 10/1/03 at 128. Residents were required to sign out at the administrative office, so that the program could determine whether a resident's absence at a head count was authorized. Id. at 132.

9

Harris was a resident at Laumaka from September 2002 through January 2003. Id. at 147. On December 18, 2002, the day of the bank robbery, defendant was supposed to have had a work pass. TR, 10/1/03 at 157. Laumaka records did not, however, reflect him picking up the pass. Id. Laumaka records also reflected that defendant was present at the 10:00 a.m. and 1:00 p.m. head counts, and no alarms were reported on that day. TR, 10/2/03 at 110.

Doveline Borges, the unit manager of Laumaka, testified that there were ways in which residents could leave the facility without detection. The fence was not very high, and residents could go over the fence after the 9:00 p.m. curfew if they wished. TR, 10/1/03 at 133. There was an area with public telephones and seats, which residents could stand on to get over the fence. Id. at 134.[2] There also were fire exits into the dormitory area which could not be locked. Id.

Defendant lived in dormitory three, where Antonio Silva also resided. TR, 10/1/03 at 173. In the beginning of December 2002, Silva had two conversations with defendant about bank robberies. Defendant asked Silva whether a bank teller would

---

[2]    The government introduced two photographs which showed portions of the Laumaka chainlink fence bent downward. Government Exhibits 32 and 33. According to Borges, this occurred when some residents climbed over the fence, or decided to leave the facility for burgers after curfew. TR, 10/1/03 at 144-45.

10

turn over money if a person gave the teller a demand note. Silva said yes.[3] Silva did not form the impression that defendant intended to rob a bank.

On one day in December, Silva did not go to work. Id. at 173-75. While sitting in the day room, Silva saw defendant walk upstairs to the second floor. Silva followed defendant, and saw him go out the fire escape. The fire alarm did not activate when that particular door was opened. Id. at 177-78. A person using that door could get out of the dormitory without detection. Id. at 178. Silva went to the first floor, and saw defendant climb over the fence right under the surveillance camera. According to Silva, the camera could not see a person at that location. Id. at 179.

On that particular day, defendant left Laumaka after the 10:00 a.m. head count, but before the 1:00 p.m. head count. Id. at 181. Silva saw defendant return to Laumaka approximately 20-30 minutes later. Id. at 189. Silva did not ask him where he went. Id.

Laumaka was located at 847 Laumaka Street, between King Street and Dillingham Avenue, in the Kalihi area of Honolulu. ER 3-5. Laumaka was located approximately three blocks from the City Bank Kalihi branch. See Government's Exhibits 46 and 48.

---

[3]    Based on conversation with others in prison, Silva was confident that tellers were trained to give money if they received a demand note. Id. at 180.

11

Harris lived in dormitory three, which was the dormitory closest to King Street, where the Kalihi Branch of City Bank was located. TR, 10/1/03 at 148. Using a stroller meter, Detective Nakamura measured the distance from City Bank, on the King Street side where the robber had exited, to Laumaka. It was about 1,392 feet. Id. at 51. The distance from City Bank to Laumaka dormitory three, where Harris resided, was approximately 1,300 to 1,325 feet. Id. at 51-52. It was approximately 1,070 feet from City Bank to the fence line by dormitory three. Id. at 59. Detective Nakamura walked the route slowly, and it took a little less than five minutes. Id.

> 4.    Defendant's Change In Appearance
>        After The Bank Robbery.

When he entered Laumaka, defendant had long hair.[4] On December 22, 2002, four days after the robbery, Peter Rabacal, a Laumaka employee, loaned hair clippers to another resident. Defendant returned the clippers on the same day, and he was bald. Prior to that, defendant had long hair. TR, 10/2/03 at 32-35. Darlene Lospoc, a clerk/typist at Laumaka, saw the same change in

---

[4]  Various witnesses said defendant wore his hair "braided" or in "dreadlocks." See testimony of Antonio Silva (braided hair about shoulder length), TR, 10/1/03 at 190; testimony of Darlene Lospoc (dreadlocks an inch or so long), TR, 10/2/03 at 23; and testimony of Peter Rabacal (dreadlocks a little above the shoulder), TR, 10/2/03 at 33-35. Doveline Borges testified that, at the time of the robbery, defendant wore his hair in the style depicted in the photograph in the photospread which was Government Exhibit 51. TR, 10/1/03 at 166.

12

appearance when defendant helped her take down Christmas
decorations on January 2, 2003.  Id. at 24-25.  Defendant's head
was completely shaven, whereas he previously had dreadlocks.
Lospoc asked what had happened, and defendant said he wanted a
new look.  Id. at 25.

II.  ARGUMENT

    A.  Harris' Motion Does Not Warrant An
        Evidentiary Hearing Because He Failed To
        Assert Specific Factual Allegation and
        Presents Only Frivolous Legal Arguments.

As an initial matter, Harris fails to present a
specific factual allegation that would warrant an evidentiary
hearing on this petition.  Section 2255 provides that a court
shall hold an evidentiary hearing on a prisoner's motion "unless
the files and records of the case conclusively show that the
prisoner is entitled to no relief."  28 U.S.C. § 2255.  The Ninth
Circuit had held that the standard for an evidentiary hearing is
whether the prisoner has made specific factual allegations, which
if true, state a claim on which relief can be granted.  United
States v. Schaflander, 743 F.2d 714, 717 (9th Cir. 1985).  Merely
conclusory statements in a Section 2255 motion are insufficient
to require a hearing.  Id. at 721.

Moreover, the allegations need not be accepted as true
to the extent they are contradicted by the record in the case.
United States v. Quan, 789 F.2d 711, 715 (9th Cir. 1986); Shraiar
v. United States, 736 F.2d 817, 818 (1st Cir. 1984).  In

13

addition, a hearing is not required where the movant's allegations, when viewed against the records of the case, either fail to state a claim for relief or are so palpably incredible as to warrant summary dismissal.  Shah v. United States, 878 F.2d 1156, 1158 (9th Cir. 1989); United States v. Schaflander, 743 F.2d at 717; United States v. Quan, 789 F.2d at 715.

In his petition, Harris provides only definitions and explanations of legal terminology and presents questions concerning the jurisdiction authority of the United States and the United States District Court and the lack of fingerprint evidence without providing any factual allegations or argument in support of his claims.  For these reasons, Harris' claims do not warrant a hearing by this Court and his motion should be summarily denied.

B.    Harris' Failure To Present His Claims To The
      District Court And On Direct Appeal
      Constitutes A Waiver That Bars Review Under
      § 2255.

Not only is a hearing on this petition not warranted, the Court need not reach the merits of Harris' claims concerning the jurisdiction of the United States and the United States District Court because he did not raise them during the underlying proceedings.  Also, the claim concerning the lack of fingerprint evidence was not raised in the district court and just briefly mentioned, but not explicitly argued, by defendant on appeal.  Having waived his rights to raise these claims in the

district court or on direct appeal, he is procedurally barred from pursuing these claims in a Section 2255 motion.[5]

Claims brought under a Section 2255 motion are waived when a defendant fails to avail himself of an opportunity to raise the claims at the district court level or on direct appeal. See United States v. Grewal, 825 F.2d 220 (9th Cir. 1987); United States v. Donn, 661 F.2d 820, 824 (9th Cir. 1981); United States v. Johnson, 988 F.2d 941, 945 (9th Cir. 1993).

In addition, any other claims concerning the sufficiency of the evidence raised in Harris' § 2255 motion should be barred as the Court of Appeals has already concluded that the direct and circumstantial evidence more than sufficed to support the jury's determination that Harris committed the bank robbery. See Exhibit 2. Where a defendant has been given a full and fair opportunity to litigate a claim on direct appeal, the claim cannot be the basis of a § 2255 motion. United States v. Redd, 759 F.2d 699 (9th Cir. 1985).

Further, Harris' claims that his attorney rendered ineffective assistance of counsel for failing to protect his

---

[5]    Harris made a claim on appeal that the pretrial photo spread identification proceedings were impermissibly suggestive and argued that the photo spread identifications were unreliable. The government argued that Harris' claim had been waived because he did not move to suppress the photo spread identification evidence prior to trial, as required by Fed. R. Crim. P. 12(b)(3), or object to its admission at trial. He also did not explicitly argue on appeal that the evidence should not have been admitted.

15

property and person, including his name, from the jurisdiction of
the Court, and for failing to argue the lack of sufficient
fingerprint evidence during trial should also be barred as Harris
has failed to demonstrate that his counsel's performance was
deficient and that he was prejudiced by his counsel's alleged
ineffectiveness.

C.    <u>Harris' Motion Must Be Denied On The Merits.</u>

In addition to denying Harris' § 2255 motion on
procedural grounds, this Court can and should deny each of
Harris' claims on the merits.

1.    This Court Had Proper Jurisdiction
      Over Harris' Prosecution.

In his ground for relief, Harris argues that the United
States District Court does not have jurisdiction over his
property and his person, including his name.  In support of these
assertions, Harris inexplicably refers to and quotes numerous
irrelevant sections of the United States Code and the Code of
Federal Regulations.  <u>See</u> Attachment at 1-11; Memorandum at 3-5.

There is no question that the District Court had
jurisdiction over the prosecution of Harris for bank robbery in
violation of 18 U.S.C. § 2113(a).  <u>See</u> 18 U.S.C. § 3231 and the
Indictment filed herein (Exhibit 1).  Harris' arguments ignore
bedrock principles of federal law.  It is well established that
"[s]ubject matter jurisdiction defines a court's authority to
hear a particular type of case."  <u>United States v. Morton</u>, 467

16

U.S. 822, 827 (1984). Under Article III of the Constitution, the judicial power of the United States is "vested . . . in such inferior Courts as Congress may from time to time establish." United States v. Delgado-Garcia, 374 F.3d 1337 (D.C. Cir. 2004), quoting U.S. Const. Art. III, § 2. Congress gave the district courts "original jurisdiction . . . of all offenses against the United States." 18 U.S.C. § 3231.

To confer subject matter jurisdiction upon the district court, an indictment merely must allege the commission of an offense against the United States. See, United States v. Ratigan, 351 F.3d 957, 963 (9th Cir. 2003). In this case, the Indictment properly alleged that Harris[6] committed a federal offense within the District of Hawaii, to wit: committing bank robbery by force, violence and intimidation, in violation of 18 U.S.C. § 2113(a). The Indictment clearly defined an offense against the laws of the United States, and thereby conferred jurisdiction upon the United States District Court for the

---

[6] At the time of the offense, Harris was a citizen of the United States and a resident of the State of Hawaii, and as such he was subject to the jurisdiction and the laws of the United States. The Fourteenth Amendment states that "all persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside." Hawaii is part of the United States, see Hawaii Statehood Admissions Act, Pub. L. No. 86-3, 73 Stat 4 (1959), and thus its citizens are subject to the laws of the United States. At the time of the offense, Harris was a resident of "Laumaka" Work Furlough Center, a residential program for transitional inmates that is associated with the Oahu Community Correctional Center.

17

District of Hawaii.  <u>United States v. Przybyla</u>, 737 F.2d 828, 829
(9th Cir. 1984).

       In the instant case, the Indictment alleged, and the
evidence at trial established that Harris committed a federal
offense within the District of Hawaii.  Therefore, there can be
no question that the United States met its burden of proving
jurisdiction.  <u>De La Maza v. United States</u>, 215 F.2d 138, 140
(9th Cir. 1954) ("[A]fter an offense under the laws of the United
States was set forth and returned in the indictment, the district
court had jurisdiction of both the subject matter and the persons
of defendants[.]"); <u>United States v. Lampley</u>, 127 F.3d 1231,
1245-46 (10th Cir. 1997).  Venue was also appropriate in the
District of Hawaii under 18 U.S.C. § 3232 and Fed. R. Crim.
P. 18.

       2.   <u>Harris' Due Process Claims Are Frivolous.</u>

       In his second ground for relief, Harris rambles on
about due process and appears to challenge the fact that no
criminal complaint and affidavit was filed against him.  <u>See</u>
Attachment at 12-16; Memorandum at 5-6.  Again, this argument is
wholly without merit as the record is clear that no criminal
complaint and affidavit was required since a grand jury returned
an indictment against Harris.  <u>See</u> Exhibit 1.

3.    Harris' Ineffective Assistance of
Counsel Argument Is Without Merit.

Harris attempts to raise matters that have previously been waived in the guise of an ineffective assistance of counsel claim.  Harris argues that his attorney rendered ineffective assistance of counsel for failing to protect his property and person, including his name, from the jurisdiction of the Court, and for failing to argue the lack of sufficient fingerprint evidence during trial.  See Attachment at 16-21; Memorandum at 6-8.  Both arguments must be denied because Harris has failed to demonstrate that his counsel's performance was deficient and that he was prejudiced by his counsel's alleged ineffectiveness.

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel:  first, defendant must show, considering all the circumstances, that counsel's performance fell below an objective standard of reasonableness. Id. at 687.  Second, the defendant must affirmatively prove prejudice.  Id.  To show that counsel's performance fell below an objective standard of reasonableness, the defendant must identify the acts or omissions of counsel alleged to have been the result of unreasonable professional judgment.  Id. At 690.  The Court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.  Id.  In making that

19

determination, counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.  Id.

Even if the Court finds that counsel's performance was deficient, relief cannot be granted absent a showing of prejudice.  To affirmatively prove prejudice, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  Id. at 694.  To demonstrate ineffective assistance of counsel, the defendant must satisfy both prongs of the test.  Id. at 697.

The defendant who raises a claim of ineffective assistance of counsel has a very heavy burden to bear, as "[i]t is all too tempting for a defendant to second-guess counsel's assistance after a conviction or adverse sentence, and all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."  Id. at 689.

In the instant case, Harris' argument regarding jurisdiction should be rejected as totally frivolous for the reasons discussed in the sections above.  Harris' claim that his counsel should have argued about the lack of fingerprint evidence is similarly frivolous in light of the overwhelming evidence of tying Harris to the crime, including the identification evidence.

20

Based upon frivolous nature of the claims that Harris argues that his counsel should have raised on his behalf, Harris cannot satisfy the heavy burden of demonstrating that his counsel acted ineffectively in failing to raise them, or that he was prejudiced by his counsel's alleged ineffectiveness. Based upon the record in this case, it is clear that the conduct of Harris' counsel was neither deficient nor prejudicial to his defense.

        4.    Harris' Claim Of Fraud Must Be
              Rejected As Totally Frivolous.

Without any specific factual support, Harris inexplicably appears to argue that the prosecutor committed fraud by failing to match fingerprints that had been lifted from the counter in the bank. See Attachment at 21-24; Memorandum at 8-11. The fact that unidentified fingerprints were recovered from the scene of the crime and were not matched to the defendant does not constitute fraud or misconduct by the prosecutor, and this Court should summarily reject this claim as frivolous.

III.  CONCLUSION

        For the reasons discussed above, this Court should find that all of the arguments raised by Harris are wholly unsupported by law or fact. As the allegations in Harris' § 2255 motion fail

//

//

//

//

21

to state a claim upon which relief can be granted, his § 2255
motion should be denied without a hearing.

DATED: _August 29, 2008_ , at Honolulu, Hawaii.

EDWARD H. KUBO, JR.
United States Attorney
District of Hawaii

By _____
RACHEL S. MORIYAMA
Assistant U.S. Attorney

22